## Case No. 18,261.

### CHARGE TO GRAND JURY—FUGITIVE SLAVE LAW.

[1 Blatchf. 635.] [1]

Circuit Court, S. D. New York. April, 1851.

THE FUGITIVE SLAVE LAW.

1. Considerations stated, which led to the enactment of the law of September 18, 1850 (9 Stat. 462), commonly called "The Fugitive Slave Law."

2. The several provisions of that law examined.

3. The prior act of February 12, 1793 (1 Stat. 302), was constitutional.

4. In regard to the power conferred by the act of 1850 upon those appointed to administer it judicially, it simply substitutes commissioners in place of the state magistrates to whom the act of 1793 confided the power.

5. The power to execute the act of 1850 is exclusive in the federal courts and officers named in it.

6. State tribunals and officers cannot, by the writ of habeas corpus, interfere with the federal authorities when they are acting upon cases arising under that act.

7. Nor can the state tribunals, under that writ, enquire into the constitutionality of the law or the jurisdiction of the federal court or officer.

8. The writ may be issued by the state authority, and it is the duty of the federal officer to make a return to it; but, when it appears that the detainer is by virtue of process issued under the act of 1850, any further proceeding under the writ is void.

9. In such case the federal officer must not give the party up, but must maintain his process with all the power conferred upon him.

10. The last clause of section 6 of the act of 1850 includes, among other process, the state writ of habeas corpus: but it does not embrace that writ when issued by the federal judiciary.

11. The constitutionality of the provisions of the act of 1850, which confer on commissioners the power to act under it, and which provide for a summary hearing and decision, was settled by the case of Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539.

12. The "judicial power" mentioned in the constitution and vested in the "courts," means the power conferred upon "courts" in the strict sense of that term —courts that compose one of the three great departments of the government; and not power judicial in its nature, or quasi judicial, invested from time to time in individuals, separately or collectively, for a particular purpose and limited time.

13. The proceeding contemplated by the clause of the constitution in regard to the delivery of fugitives from service or labor, is not a suit at common law,

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

within the meaning of the seventh amendment to the constitution.

14. So far as state laws conflict with the act of 1850, or tend to obstruct and embarrass its execution, they are utterly void.

At the commencement of the term, NELSON, Circuit Justice, in charging the grand jury, after instructing them upon the law applicable to the several cases that were to come before them, proceeded as follows:

Besides these instructions in respect to the cases on the calendar of the district attorney furnished to the court, I desire to call all your attention, with some particularity, to a recent act of congress, commonly called "The Fugitive Slave Law," passed September 18, 1850.

. This act has been the subject of much comment since its passage, and of various and conflicting opinions, both as concerns the constitutional principle involved, and the matters in detail embodied in its several provisions. It is a law, open resistance to the execution of which, as unconstitutional, has been recommended in some quarters; and in others, whether constitutional or not. As all persons concerned directly or indirectly in this resistance, or in any obstruction to its due execution, are guilty of an offence, and subjected to heavy punishment criminally, and also by civil damages to the aggrieved party, it is proper that the law should be understood, so that those, if any there be, who have made up their minds to disobey it may be fully apprised of the consequences.

The act, as you are aware, was passed for the purpose of carrying more effectually into execution a provision of the constitution of the United States; namely, a part of the second section of the fourth article. That provision is as follows: "No person held to service or labor in one state under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due."

At the time of the adoption of the constitution by the convention, on the 17th of September, 1787, slavery existed, I believe, to an extent more or less in each of the states then composing the Confederacy. About one-fifteenth of the population of New York were slaves; the proportion in the New England states and Pennsylvania was much less; and in New Jersey about the same as in New York. All the original states, therefore, were interested, more or less, in the adoption of this provision into the constitution, but more especially the Southern states, where, speaking generally and without strict accuracy, about half the population consisted of this class. It was, however, anticipated that, in the progress of time, slavery, while it would increase in the South, would diminish and finally become extinguished in the North.

So just was this provision regarded at the time by the members of the convention, and so necessary for the security of this species of labor, and the existence of friendly relations between the different members of the Union, that it was adopted without opposition, and by a unanimous vote. It was of the deepest interest to the Southern states, as, without the provision, every nonslaveholding state in the Union would have been at liberty, according to the general law of nations, to have declared free all runaway slaves coming within its limits, and to have given them harbor and protection against the claims of their masters. I need not say at this day, that such a state of things would have led inevitably to the bitterest animosities, especially between border states, and have been the source of perpetual strife, and of the fiercest passions, between the Northern and Southern portions of the Union. The evil was felt at the time by the Southern portion, as the articles of confederation contained no such provision; and it was to guard against that evil, and to lay a

foundation that would afford future security, and preserve the friendly relations and intercourse of the states, that the provision was incorporated into the fundamental law. No one conversant with the history of the convention, and particularly with the difficulties that surrounded this subject in almost every stage of its proceedings, can doubt for a moment, that without this, or some equivalent provision, the constitution would never have been formed. It was of the last importance to the Southern portion of the Union, and could not have been surrendered without endangering their whole interest in this species of property. It is not surprising, therefore, that it is still adhered to with unyielding resolution, and is made the groundwork of a question upon which the continued existence of a Union thus formed is made to depend.

The clause in the constitution is general, and simply declares that the slave escaping into another state shall not thereby be discharged, by any law or regulation of the state to which he has fled; but shall be delivered up on claim of the person to whom the service is due.

The mode of delivering up to the claimant is not prescribed, and, until regulated by law, continued to be the source of embarrassment to the master, and of disturbance and disquietude among the states. This led to the first act of congress, passed February 12, 1793, during the sitting of the second session held under the constitution. It was enacted by a body of men, several of whom had been distinguished members of the convention, and is framed, in its leading features, in the spirit of the provision of the constitution which it was designed to carry into effect. It is signed by Jonathan Trumbull, of Connecticut, as speaker of the house of representatives, and John Adams, as vice president and president of the senate, and approved by George Washington, president of the United States, and was passed on the urgent recommendations of the governors of Pennsylvania and Virginia, between which states a difficulty had arisen in the surrender of fugitives.

The first section on the subject declares, that when any person held to labor in any of the United States, or in either of the territories, under the laws thereof, shall escape into any other state or territory, the person to whom such labor may be due, shall be authorized to seize or arrest such fugitive, and take him or her before any judge of the circuit or district courts of the United States, residing or being within the state, or before any magistrate of a county, city or town corporate, wherein such arrest shall be made, and upon proof to the satisfaction of the judge or magistrate, either by oral testimony or affidavit, that the person so arrested owes service to the person claiming him or her, it shall be the duty of the judge or magistrate to give a certificate thereof to such claimant, which shall be a sufficient warrant for his or her removal to the state or territory from which he or she fled. The remaining section inflicts a penalty upon any person who shall knowingly obstruct or hinder the claimant from arresting the fugitive, or rescue the same from him, or harbor or conceal the fugitive after notice.

This act has been on the statute book and in operation for more than fifty-seven years. Its constitutionality has been recognized and affirmed by the courts of Massachusetts, Pennsylvania and New York, and by the supreme court of the United States in Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539, and has never been denied by any court, with the qualification that will be presently noticed. The case of Prigg v. Pennsylvania, in the courts of that state, is no exception to these remarks, as the jury found a special verdict, and the judgment was entered pro forma by agreement of counsel, for the purpose of carrying the question before the supreme court.

Doubts had been expressed, and, in some in-

stances, decided opinions given by state judges, that it was not competent for congress to confer upon state magistrates the power to carry into execution a law of congress, inasmuch as the judicial power of the federal government was vested by the constitution in a supreme court, and in such inferior courts as congress might ordain and establish. It was also argued with much force, that if congress possessed this power, it might burden the state judiciary and magistrates with duties that would be incompatible with, or embarrass the faithful discharge of those which concerned the state.

Influenced by these views, or some others, the legislatures of some of the states passed laws forbidding their own magistrates from acting under the law in the surrender of fugitives, and enforced the prohibition with heavy penalties. It is not doubted that it was entirely competent for the states to prohibit their own magistrates from assuming the duty of executing the law; but it was held in Prigg v. Pennsylvania, to be clear, that if not so forbidden, it was competent for them to act, and that the exercise of the authority under the law would be valid and binding upon all the parties concerned. This interference of the state legislatures greatly paralyzed the execution of the law; and, indeed, had the effect, for the time being, to abrogate virtually the provision of the constitution. It left but one, or at most two officers in a state, competent to execute it, as the power was thereby restricted to the circuit and district judges of the United States. Our own state, as early as 1830, forbade her magistrates from acting, under the penalty of fine and imprisonment. 2 Rev. St. p. 561, § 14. These, and other more direct interferences by legislative acts of the states with the execution of the law of 1793, together with the open resistance with which its execution was met in some instances, by combinations against law, led, necessarily, to the recent supplementary act; and to which I wish now particularly to call your attention.

This act is designed, first, to substitute officers of the federal government in the place of these state magistrates; and second, to arm the officers with sufficient power and authority to enable them to execute the law against any resistance actual or threatened, and in whatever form it may be presented. The act has grown out of the exigencies and necessities to which I have referred, and was forced upon the attention of congress, mainly by the legislative interference of the states. Had not the law of 1793 been thus crippled it would, probably, have afforded all the means necessary to the execution of the constitutional provision.

This supplementary act is obviously framed with great skill and care; and bears upon its face the deep conviction of the body that enacted it, that the constitutional provision had not only been disregarded, but, that a settled purpose, a fixed determination, existed in some portions of the country, to set its obligations at naught. The act meets this condition of things, real or supposed, and clothes the public authorities with powers adequate to the exigency.

It confers authority upon commissioners appointed by the circuit courts of the United States, in addition to the judges, to carry into execution its several provisions, and makes it the duty of the marshals and deputy marshals to execute all warrants and precepts issued by the judges or commissioners under the act, subjecting them to a fine of $1,000, to the use of the claimant, in case of refusal; and, after the arrest, and while the fugitive is in their custody, if he or she is allowed to escape with or without their assent, the marshal is made liable upon his official bond, to be prosecuted for the benefit of the claimant, for the full value of the slave. The commissioners are also empowered, within the counties in which they respectively reside, to appoint, in writing, one or more suitable persons, from time to time, to execute all warrants and other process issued by them in the performance of their duties, with authority to the commissioners, or the persons thus appointed, to summon and call to their aid the by-standers or posse comitatus of the county, when necessary to insure the due execution of the law; and it is made the duty of the citizens thus called to the aid of the officers, to assist in the execution of the process whenever their services are required.

The act further provides, that the claimant may pursue and reclaim the fugitive, either by procuring a warrant from the court, judge or commissioner of the proper circuit, district, or county, for his apprehension, or by arresting him, or her, where it may be practicable, without warrant, and by taking or causing the fugitive to be taken forthwith before the proper officer, whose duty it is made to hear and determine the case in a summary manner; and, upon satisfactory proof, either oral or by deposition, properly taken and certified, that the person so arrested owes service and labor to the claimant, in the state or territory whence he or she fled, and that he or she had escaped from such service, to grant a certificate to the claimant, setting forth substantially the facts of the case. This certificate is made conclusive evidence of the right of the claimant to remove the fugitive back to the state or territory whence he or she escaped, and is declared to be sufficient authority to prevent all molestation of the claimant by any process issued by any court, magistrate, or other person whomsoever.

The act subjects to fine and imprisonment, and also to civil damages to the party aggrieved, any and every person who shall knowingly obstruct, hinder or prevent the claimant or his agent from arresting the fugitive, either with or without process, or who shall rescue or attempt to rescue the same from the custody of the claimant or his agent, or who shall aid or assist, directly or indirectly, in the escape of the fugitive, or who shall harbor or conceal the same, so as to prevent the discovery and arrest, after notice that such person is a fugitive from service.

The act further provides, that if the claimant or his agent shall make affidavit, after the certificate is granted, that he has reason to apprehend a rescue by force, before the fugitive can be taken beyond the limits of the state in which the arrest is made, it shall be the duty of the marshal or officer making the arrest, to retain the fugitive in his custody, and to remove the same to the state whence he or she had escaped, and there to deliver him or her to the claimant or his agent; and to employ as many persons as he may deem necessary to overcome such force; and to retain them in his service so long as, in his judgment, the circumstances may require.

These, together with some regulations as to the mode of proof before the judge or commissioner, embrace substantially every material provision of the act. And it will excite, I think, some surprise, after the determined opposition to its passage, and even threatened, and, in some instances, actual resistance to its execution in certain quarters, when it is seen, that there is not a power conferred upon those appointed to administer it judicially, that was not conferred upon the judges and other state magistrates under the act of 1793—a law approved by Washington and Adams, and enacted by the fathers and founders of the republic. It is simply, in this respect, a substitution of the commissioners in the place of the state magistrates, who were disabled and prevented from discharging the duty by the state authorities. Full confidence was reposed in them by the federal government, so long as they were permitted to act. When thus disabled, other officers were selected, of necessity, to supply their places. This is the only difference, as it regards

the judicial authority conferred by the act. Neither is there any power conferred by it on the claimant, his attorney, or agent, that is not found in the act of 1793. All the additional powers are conferred upon the ministerial officers, the marshals and deputy marshals, who are required to execute the warrants and other process issued in pursuance of its provisions, and which warrants and process are the same as those provided for in the previous act, and none others. Every ground of opposition to this recent act, distinguishable from opposition to the former, is exclusively referable to the powers with which the marshal and his deputies are armed with a view to its execution—powers essential to enforce obedience to the mandates of the officers, and to put down, with a strong hand, if necessary, all disaffection, disorder, insubordination, or resistance, in whatever form presented. The apprehension that any new or extraordinary powers have been vested in the judges or commissioners is entirely groundless; there is not even a pretext for any such apprehension. The only apprehension for which there is the slightest foundation is, that the powers which have been possessed by the judges and state magistrates, since the act of 1793, and are now given to the commissioners in their places, may be effectually executed; that the law is made stronger than the combinations and treasonable influences arrayed against it; and that the provision of the constitution may be enforced and executed in the faith and spirit in which it was adopted.

Another subject arising out of the provisions of this law, and which has a material bearing upon its execution, it is proper should be noticed. By the second section of the third article of the constitution it is declared, that "the judicial power shall extend to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made, under their authority." The power, therefore, it will be seen, to execute this act of congress belongs to the tribunals and authorities of the federal government; and, in respect to these, can be executed only by such courts or officers as are especially designated in the act for the purpose. The power, therefore, is exclusive in these courts or officers, both as it respects the tribunals of the state, and others of the federal government. Neither can act or interfere in the execution of the law; and, in case of any attempt by either to interfere or exercise the authority, its acts would be coram non judice and void. These propositions are elementary, and so obvious as to require no further comment.

It seems to be supposed, however, in some quarters, that the state power exercised by its tribunals under the writ of habeas corpus, forms an exception to this generally admitted doctrine; and that, through the agency of this writ, the fugitive may be taken out of the hands of the federal officers, and the authority or propriety of the arrest or detainer be inquired into, and the person be discharged or remanded, according to the judgment of the state magistrate. This is the exception claimed to the exclusive power of the federal officers designated in the act.

It is apparent, if this exception can be maintained, that there is an end to the complete execution of the law; or, indeed, of any law of the general government by which the party is subject to an arrest. It is not claimed that the state magistrate can, under this writ, administer the act and enforce its provisions, as that authority, as we have seen, is confined to the tribunals appointed by the act for the purpose. The fugitive must therefore be taken, if taken at all, out of the hands of the federal officers by force of some other law; and the question whether he or she shall be discharged or remanded, will depend upon the application of that law to the particular case. What that law is, or may be, must necessarily depend up-

on state regulation; and the rights of the claimant under the constitution and laws of the Union will thus be determined by a law of the state.

The effectual abrogation of the act by the interposition of this writ, if admitted, will be still more apparent, when we reflect that the power exercised under it is such as the state legislatures may choose to prescribe; and that the state tribunals are not only invested with that power, but, if they act at all, are bound to act in obedience to and in conformity with it. There is no limit, therefore, to the extent of the powers that may be exercised under this proceeding, in respect to the arrest and detainer of the fugitive, but the discretion of the state legislatures. They may confer jurisdiction upon their magistrates to re-examine and revise the acts and decisions of the federal tribunals out of whose hands the fugitive is taken, and the state magistrate would be bound to execute the power accordingly. It is manifest that it would be impossible to uphold the due execution of the law with the admission of any such authority.

Conceding, however, the soundness of this general view, and the inability of the state tribunals to interfere with the federal authorities when they are acting upon cases arising under the constitution, laws of congress, or treaties, still, it is argued that they possess the power, under this writ, to inquire into the legality of the authority under which the prisoner is held, and which may involve the constitutionality of the law and the jurisdiction of the court or officer. But, it is obvious that the existence of either power, on the part of the state tribunals, would be fatal to the authority of the constitution, laws, and treaties of the general government. No government could maintain the administration or the execution of its laws, civil or criminal, if their constitutionality, or the jurisdiction of its judicial tribunals, were subject to the determination of another. I need not stop, however, to discuss this question, as it arose and was settled in the case of U. S. v. Peters, 5 Cranch [9 U. S.] 115, more familiarly known as Olmstead's Case. The legislature of Pennsylvania had passed an act declaring that the jurisdiction claimed by the district court of the United States was unconstitutional, and empowered the governor to resist the execution of its judgment. Chief Justice Marshall, in delivering the opinion of the court, observed, that "if the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery; and the nation is deprived of the means of enforcing its laws by the instrumentality of its own tribunals." He further remarked that "if the ultimate right to determine the jurisdiction of the courts of the Union is placed by the constitution in the several state legislatures, then this act concludes the subject; but, if that power necessarily resides in the supreme judicial tribunal of the nation, then the jurisdiction of the district court of Pennsylvania over the case in which that jurisdiction was exercised, ought to be most deliberately examined; and the act of Pennsylvania, with whatever respect it may be considered, cannot be permitted to prejudice the question." I need not add that the judgment was regularly enforced, notwithstanding the state act.

There have been different opinions entertained by the judges of the states as to their power, under this writ, to decide upon the validity of a commitment or detainer by the authority of the United States. But those who have been inclined to entertain this jurisdiction, admit that it cannot be upheld, where it appears from the return that the proceeding belonged exclusively to the cognizance of the general government. This necessarily results from the vesting of the judicial power of the Union in

the federal courts and officers; and from the fourth article of the constitution, which declares, that "this constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." If the exclusive power to execute the act is in the federal judiciary, and the act is to be regarded as the supreme law of the land, and to be obeyed as such, it is difficult to see by what right or authority its execution can be interfered with, through the agency of this writ, by state authorities. Any such interference would seem to be a direct infraction of the constitution.

It is proper to say, in order to guard against misconstruction, that I do not claim that the mere fact of the commitment or detainer of a prisoner by an officer of the federal government, bars the issuing of this writ, or the exercise of power under it. Far from that. Those officers may be guilty of illegal restraints of the liberty of the citizen, the same as others. The right of the state authorities to enquire into such restraints is not doubted; and it is the duty of the officer to obey the authority, by making a return. All that is claimed or contended for is, that when it is shown that the commitment or detainer is under the constitution, or a law of the United States, or a treaty, the power of the state authority is at an end; and any further proceeding under the writ is coram non judice, and void. In such a case, that is, when the prisoner is in fact held under process issued from a federal tribunal under the constitution, or a law of the United States, or a treaty, it is the duty of the officer not to give him up, or allow him to pass from his hands in any stage of the proceedings. He should stand upon his process and authority, and, if resisted, maintain them with all the powers conferred upon him for that purpose. I certainly do not anticipate any such exigency. Far from it. The habitual respect of the judiciary, state and national, for the law of the land, and legal authority, forbid it. But it is proper that the officers should know their rights and their duties, if, unfortunately, by possibility, any such exigency should arise.

These views of the paramount authority of the laws of the federal government in no way endanger the liberty of the citizen. The writ of habeas corpus secured to him under that government, affords the appropriate and effectual remedy for any illegality in the process or want of jurisdiction in the court, or for any unconstitutionality of the law. The remedy is as prompt and summary, as when administered by the state judiciary: and, in this way, by conceding to each government the free and unobstructed execution of its own laws and exercise of its own authority, harmony is maintained and perpetuated in the working of our most complex system of government.

The views I have presented will explain a provision in this act of 1850, which is somewhat obscure. I allude to the last clause of the sixth section, which declares, that the certificate granted to the claimant to remove the fugitive "shall prevent all molestation of such person or persons by any process issued by any court, judge, magistrate, or other person whomsoever." This clause doubtless includes, among other process, the state writ of habeas corpus. It could not have been intended, or at least ought not to be construed as intending to embrace that writ when issued by the federal judiciary, as congress did not possess the power to suspend it. As it respects the state writ, we have seen, from the views expressed, that it is but declaratory of the existing law, and not the introduction of any new principle. With-

out this clause, the paramount authority of the certificate would have been the same, so far as that process was concerned.

It has been made a question upon this act, whether or not it was competent for congress to confer the power upon the United States commissioners to carry it into execution. As the judicial power of the Union is, by the constitution, vested in the supreme court, and in such inferior courts as congress may from time to time establish, the judges of which shall hold their offices during good behavior, it has been supposed that the power to execute the law must be conferred upon these courts, or upon judges possessing this tenure. It is a sufficient answer to this suggestion, that the same power was conferred upon the state magistrates by the act of 1793; and which, in the case of Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539, was held to be constitutional by the only tribunal competent, under the constitution, to decide that question. No doubt was entertained by any of the judges in that case, that these magistrates had power to act, if not forbidden by the state authorities.

The judicial power mentioned in the constitution, and vested in the courts. means the power conferred upon courts ordained and established by and under the constitution, in the strict and appropriate sense of that term—courts that compose one of the three great departments of the government prescribed by the fundamental law, the same as the other two, the legislative and the executive. But, besides this mass of judicial power belonging to the established courts of a government, there is no inconsiderable portion of power, in its nature judicial — quasi judicial — invested, from time to time, by legislative authority, in individuals, separately, or collectively, for a particular purpose and limited time. This distinction, in respect to judicial power, will be found running through the administration of all governments, and has been acted upon in this, since its foundation. A familiar case occurs in the institution of commissions for settling land claims and other claims against the government. 2 Stat. 324, 440. A strong illustration will be found in this state, under the old constitution of 1777. By that, justices of the peace were appointed by the council of appointment, and held their offices during the pleasure of that body. Yet, the powers possessed by these magistrates were conferred by acts of the legislature upon the aldermen of cities, who were elected by the people. But I need not pursue the subject, as the question must be regarded as settled by the case referred to.

The same answer may be given, also, to the objection founded upon the seventh amendment to the constitution, which provides that "in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." The summary mode of hearing and deciding upon the claim to the service of the fugitive, prescribed by the recent act, is the same as that prescribed by the act of 1793, which the court, in the case already referred to, held to be clearly constitutional in all its leading provisions. The proceeding contemplated by the clause of the constitution in question, is not a suit at common law, within the meaning of that amendment. It settles conclusively no right of the claimant to the service of the fugitive, except for the purpose of the removal to the state from which he or she fled—no more than the proceeding, in the case of a fugitive from justice, for the purpose of removal, settles his guilt. The question of right to the service in the one case, and of guilt in the other, is open to a final hearing and trial in the states whence the fugitives escaped. After their arrival there, the certificate is no longer of any authority, or evidence of any right. Indeed, so obviously does the constitution contemplate a summary hearing and decision in the matter, that the counsel for the state

of Pennsylvania, in the case referred to, did not make it a point or call it seriously in question on the argument.

I have now gone over the several provisions of this law, and some of the more material questions arising out of it; and, if I am not greatly mistaken, have shown that all the leading features of it, all the principles involved, have been either confirmed by the only tribunal competent to pass upon them, or are so obvious that no lawyer can entertain a well grounded doubt upon them; and that congress has but obeyed an imperative constitutional obligation in its enactment. It is a law, therefore, which every citizen is bound to obey, and the public authorities to enforce, with all the powers conferred upon them by the government.

The legislatures of some of the states have passed laws bearing directly upon this provision of the constitution, and upon its execution in the mode prescribed by congress. So far as these laws are in conflict with the provisions of the one in question, or tend to obstruct and embarrass its execution, they are unconstitutional, and utterly void; and can afford no protection against its penalties. The law of congress is paramount, and must be obeyed.

Opinions were expressed in the case of Prigg v. Pennsylvania, that the power of congress to provide the mode of surrendering up the fugitive under the constitution was exclusive, and that the states were disabled from acting at all on the subject; others, that the power was concurrent, and, although the states could pass no law in conflict with the act of congress, it was competent for them to pass laws in aid of it, and in furtherance of the execution of the constitutional provision. It is not important here to express any opinion upon these different views; for, whether the one or the other shall finally prevail, the result is the same. In either view, a law in conflict with the act of congress is void, and of no effect.

It is not to be disguised, that the legislation of most if not all of the Northern states, tending to embarrass, and, in some instances, to annul the provisions of the act of 1793, has strongly impressed our Southern brethren with the conviction, that these states have resolved to throw off this constitutional obligation. They take it for granted, and it is difficult to deny the inference, that the acts reflect the general sentiment of the people on the subject; and that that must have become deep and abiding, to be sufficiently powerful to mould the legislation of the states. It is this legislation, more than occasional riotous asesmblies in resistance of the law, that has forced them to the question, whether the Union, with this provision of the fundamental law rejected and contemned—a provision vital to the rights and interests of that portion, and without which the Union would never have been formed—is to them a blessing or a curse. A question raised, not by disaffected and tumultuous assemblages, often very equivocal evidence of the real sentiment of the public mind, but by the people of the states, through their organized governments; a question examined and discussed in the mode and through the agencies that examined and discussed that of entering into the Union at the adoption of the constitution.

This question has been raised by fifteen states of the Confederacy, six of whom were original parties to the compact. It has been examined and considered over and over again, by the governors in their public messages, by the representatives in their legislative halls, by the people in their primary assemblies, and by the press; and they have come to the resolution, one and all, that if this hostile legislation is carried into effect, and the constitutional obligation is no longer adhered to by their Northern brethren, but thrown off, disregarded, and contemned, the Union is no longer a blessing, and should be dissolved—that the abrogation of one material provision of the fundamental law is

destructive of the compact—and that the portion of the Union for whose benefit it was adopted, and whose rights and interests are thereby endangered, is absolved from its allegiance. This I believe to be the settled conviction and sentiment of fifteen states of this Union, and it presents an issue of the gravest aspect, and one that can neither be evaded nor suppressed. It is an issue which the Northern states must determine for themselves. That laws exist on the statute books of most, if not all of them, in conflict with the act of congress, and repugnant to this provision of the constitution, is matter of history. That the enforcement of these laws would be a virtual abrogation of the provision, is not to be denied. It remains for these states to determine whether any attempt shall be made to enforce them—whether they are to remain on the statute book a dead letter, or be repealed. These are questions of transcendent import: for the determination of them, in my humble judgment, involves the perpetuity of the Union.

I am aware that opinions are entertained, and doubtless honestly entertained, that the Union has not been at any time in danger, and is not now. I wish these opinions were well founded. My deep conviction and belief are, that it depends, at this moment, upon the confidence inspired by the late proceedings in congress, and by the indications of public sentiment in the free states that this constitutional obligation will be hereafter executed in the faith and spirit with which it was entered into; that the friends of the Union in the slaveholding states now maintain their ascendency, and the allegiance of their states, by the confidence thus inspired; and that in case of any action on the part of the Northern states, destructive of that confidence, and of all hope of the execution of the obligation, it would not be in their power to maintain their position—and, I may add, they would not, if they could.

If any one supposes that this Union can be preserved, after a material provision of the fundamental law upon which it rests is broken and thrown to the wind by one section of it—a provision in which nearly one-half of the states composing it are deeply and seriously interested—he is laboring under a delusion which the sooner he gets rid of the better. If it is preserved, which I do not doubt, it will be by a stern adherence to this fundamental law, and to every part and parcel of it: neither section can throw off the obligation of a part in which it has no interest, and expect to preserve the Union. The very supposition implies degradation and dishonor, broken faith on the one side, and abject submission on the other.

Neither can the motive for breaking the compact afford any apology or justification. If one article may be set aside by one portion, because it is repugnant to their sense of right and justice, another may be by another, because it is against their interest. That "no state shall, without the consent of the congress, lay any imposts or duties on imports or exports," is an article of this fundamental law. Suppose New York, deeming this article prejudicial to her interests by crippling too much her resources and revenue, should levy duties upon the immense trade and exchange now existing between the Great West and our Eastern brethren; or upon the vast coal trade with our neighboring sister, Pennsylvania, for which we afford so extensive a market; would the motive afford any excuse for the infraction of the constitution? And yet, looking at the compact, and to the constitutional duties and obligations arising out of it and binding all, this motive is just as available as any other to excuse or justify the infraction. The example of breaking the compact upon any motive is dangerous. With what face can one state rebuke another for want of allegiance, when she has thrown it off herself? Her rebuke would be "laughed to scorn."

This Union must be preserved, if at all, by that stern, old-fashioned honesty and principle which inculcates the fulfilment of the whole of our constitutional duties and obligations, and of every part of them. It was this spirit that formed the compact, and has thus far preserved it through all its trials and assaults; and it is this spirit that must and will, I trust, carry it safely hereafter through whatever perils and misfortunes it may be destined to encounter. As men possessing these sturdy and manly virtues have thus far been found in the republic, equal to every trial and exigency, so, I do not doubt, such men will be found hereafter. And they will have their reward—the blessing of all good men of the times in which they live, and of unborn millions, who will be indebted to them, under the favor of heaven, for the rich heritage they enjoy.