## Case No. 12,848.

### Ex parte SIFFORD.

[5 Am. Law Reg. 659.]

District Court, S. D. Ohio. 1857.

HABEAS CORPUS—RETURN—CUSTODY OF MARSHAL—CONFLICT OF AUTHORITY.

1. A return to a writ of habeas corpus, issued by a judge of the United States, under the judiciary act of 1789 [1 Stat. 73], showing an imprisonment under process, legal and valid on its face, is conclusive, and precludes further inquiry into the cause of imprisonment.

[Cited in Re Farrand, Case No. 4,678.]

2. But the seventh section of the act of congress of the 2d of March, 1833 [4 Stat. 634], expressly confers on a judge of the United States the power to issue the writ of habeas corpus, in all cases of imprisonment by any authority of law, for any act done or omitted in obedience to a law of the United States;· and where such imprisonment is for an alleged violation of a state law, and by state authority, the judge or court issuing the habeas corpus may inquire into the circumstances ·under which the alleged crime was committed, with a view to the question whether the act complained of was done or omitted in the proper discharge of official duty, and under the authority of the United States; and, if it appears the act was so done or

omitted, the judge or court is authorized to discharge the party from such imprisonment.

[Cited in Re Neill, Case No. 10,089.]

3. A marshal having a person in custody under lawful process, is bound to retain such custody, and in so doing may use such force as is necessary; and in the proper use of such force, is not guilty of a crime against the law of the state in which the transaction occurred.

[Cited in U. S. v. Fullhart, 47 Fed. 804.]

4. A state judge has no jurisdiction to issue a habeas corpus for a prisoner in the lawful custody of an officer of the United States, with a knowledge that he is so held; and if, on the return of the writ, it appears the imprisoned party is held by an officer of the United States under legal process, the jurisdiction of the state judge ceases, and all further proceedings by him will be coram non judice.

[Cited in Re Farrand, Case No. 4,678; Re Reynolds, Id. 11,722.]

5. A sheriff, or other state officer, having a so-called writ of habeas corpus, under the Ohio statute of 1856, and having knowledge that the prisoner named in the writ is in the custody of an officer of the United States, under legal process, is under no obligation to serve, or attempt to serve, such writ; and his return of the facts is a sufficient justification for not serving it.

6. A marshal, having custody of a prisoner under the authority of the United States, is not bound to surrender such prisoner upon the demand of a state officer, having a writ issued under the said Ohio statute, requiring him to take the prisoner from such custody.

[Cited in brief in Ex parte Holman, 28 Iowa, 94.]

7. But if the habeas corpus in the hands of the state officer is issued in good faith, and is the well known writ of that name, requiring the officer of the United States having the custody to bring the prisoner before the judge or court issuing the writ, with the cause of the caption and detention it is the duty of such officer to obey such writ, as thereby he does not part with the custody of the prisoner; and such obedience will not be in conflict with his duty.

8. It is well settled by the adjudications, both of the courts of the Union and the states, that, in case of concurrent jurisdiction, the tribunal or court to which jurisdiction first attaches shall retain it; and neither has a right to interfere with the other.

[Cited in Bruce v. Manchester & K. R. Co., 19 Fed. 344.]

At law.

Stanley Matthews, George E. Pugh, and C. L. Vallandingham, for petitioners.

R. Mason and C. P. Wolcott, contra.

LEAVITT, District Judge. There is no cause to regret the indulgence which has been extended to counsel, in the presentation and discussion of this case, or the time, which, for reasons not necessary to be stated, has elapsed since the hearing commenced. In some aspects, the questions arising are important, and require great deliberation in their decision. Every case of conflict between the national and state authorities casts upon the judge or court called to pass upon it a most responsible duty; and such cases are the more embarrassing and difficult when the jurisdiction of the judge or court is challenged, and a decision of that question becomes necessary. It has been my aim to consider with calmness the case before me, and to reach such conclusions as my judgment will approve. If I have succeeded in this, the criticisms of those differing from me in my views will, I trust, have no disturbing influence.

On the 27th of May last, Lewis W. Sifford, the marshal of the United States for the Southern district of Ohio, presented his petition, duly sworn to, for a writ of habeas corpus, alleging, among other things, that Benjamin P. Churchill and nine others, being deputy and assistant marshals, were unlawfully imprisoned in the jail of Clark county, by a process issued by a justice of the peace of said county, for acts done, or omitted to be done by them, as such deputies and assistants, in the proper discharge of their duties under a law, and by the authority of the United States. A writ of habeas corpus was issued, according to the prayer of the petition, directed to John E. Dayton, sheriff of said Clark county, requiring him to have the said Churchill and others, forthwith, before this court, with the cause of their caption and detention. The sheriff has promptly obeyed the writ, and has made a special return, stating the circumstances under which the deputies and assistants were delivered into his custody. The important questions arising in the case are presented on a motion for the discharge of these persons.

The facts necessary to be noticed, preliminary to the consideration of the points presented, are, that on the 23d of May last, separate warrants were issued by Edward R. Newhall, a commissioner of the circuit court of the United States, for the arrest of Hiram Gutridge and three other persons, residents of Champaign county, on charges of having aided and abetted a fugitive slave in his escape, and having resisted and obstructed the officers of the United States in the arrest of such fugitive. The persons named in the warrants were arrested by the deputy marshals and assistants; and when conveying them to Cincinnati, where the warrants were returnable, an attempt was made by the sheriff of Clark county to take said prisoners from the custody of the officers by a habeas corpus issued by the probate judge of Champaign county. The sheriff, in his return to the habeas corpus issued to him from this court, alleges that the writ issued by the probate judge was put into his hands for execution by the sheriff of Champaign county, and that, in company with one Compton as an assistant, he attempted to serve it, by taking possession of the four prisoners in the custody of the deputy marshals and their assistants; and that in this attempt he was violently resisted and assaulted, and failed to execute the writ according to its command. It appears that, on a complaint made before one Huston, a justice of the peace of Clark county, that the deputies and their assistants had unlawfully assaulted and beat the said sher-

iff, they were subsequently seized by a large armed force and taken before the said justice, and by him committed to the jail of Clark county; and while so in custody, a new complaint was made against them for an assault on the sheriff with intent to kill, and for shooting at said Compton with intent to kill, &c., before one Christie, a justice of the peace for said county, on which they were again arrested and committed to jail. It may be noticed here that, after the seizure of the deputy marshals by the armed force, as above stated, and the consequent rescue of the prisoners from their possession, they were taken by the sheriff of Greene county before the probate judge of Champaign, by virtue of the habeas corpus issued by him and were summarily discharged by his order, and have since been at large.

In considering the question before me, I shall not attempt to review the extended and able arguments of the counsel, or notice all the points raised in the discussion. It has been insisted very strenuously that this court cannot order the discharge of the deputy marshals, on the ground that, at the time the writ of habeas corpus was served, the imprisonment alleged as existing when the writ issued had ceased, and they were then in custody on process afterwards issued. I do not propose to consider this point further than to remark that, from the return of the sheriff of Clark county, it would seem at least doubtful whether, at the time of the service of the habeas corpus, the deputies were in custody under the first or the second warrant. There seems to have been a continuous custody under these warrants; and it would be somewhat technical, in such a case as this, to base an order for remanding the deputies on the ground stated. It is also urged—and this is the main point of the argument of the counsel resisting the discharge of the persons in custody—that, as it appears from the return to the habeas corpus, they are in the custody under process issued by a justice of the peace, regular and lawful on its face, this court has no jurisdiction to go behind that process, and inquire for what cause and under what circumstances it issued.

It is admitted that, in reference to the writ of habeas corpus issued by the courts and judges of the United States, under the judiciary act of 1789, the position assumed is undoubtedly correct. The return of the officers showing a detention under process, legal and valid on its face, would be conclusive and preclude the court or judge from further inquiry under that act. But the habeas corpus now in question, was issued under the second section of the act of the 2d of March, 1833, which provides, "that either of the justices of the supreme court, or a judge of any district court, in addition to the authority already conferred by law, shall have power to grant writs of habeas corpus in all cases of a prisoner or prisoners in jail or confinement, when he or they shall be committed or confined on or by any authority of law for any act done, or omitted to be done, in pursuance of a law of the United States, or any order, process or decree of any judge or court thereof—anything in any act of congress to the contrary notwithstanding." The words of this provision are so explicit and intelligible, that there would seem to be no room for doubt as to their meaning. They do confer and were intended to confer, on a federal judge, the power to issue the writ of habeas corpus whenever there is an imprisonment "by any authority of law for any act done or committed under a law of the United States." Now, the point to be inquired into and determined by the judge issuing the habeas corpus is, whether the act for which the party is imprisoned has been done in the discharge of official duty, under the authority contemplated by the provision referred to. But if the return to the writ, showing an imprisonment, under state process, shuts out all further inquiry, the act of congress is a dead letter and its purpose altogether defeated. The occasion of the passage of the act of congress of 1833 has been referred to; and, it is contended in argument, that it must be limited in its operation to a state of things similar to that then existing; and was intended only to guard against nullification, when it appeared in the form of resistance by state authority, to the revenue laws of the United States. It was doubtless such threatened resistance that called the law into being. But, it has been permitted to remain on the statute book, in full force for upward of twenty-five years. This has not been the result of accident or inadvertence. It was obvious to the members of congress, and the statesmen, who have, since the engactment of the law, participated in the affairs of the country, that it was a wise provision and necessary to meet any subsequent case of improper interference by a state with the legislation of congress, in matters pertaining to the national government, and within the range of its exclusive powers.

There is high judicial authority for the exercise of the power in question by a judge of the United States, under the act of 1833 in the case of Ex parte Robinson [Case No. 11,935], known as the Rosetta Case. The facts stated are, that a female slave, traveling in company with her master, in the state of Ohio, was taken by a writ of habeas corpus before a probate judge, at Columbus, and adjudged by him to be free. She was afterwards arrested by the marshal, as a fugitive, upon a warrant issued by a commissioner; and upon a habeas corpus, issued by Judge Parker of the court of common pleas of Hamilton county, the alleged fugitive was discharged from the custody of the marshal. She was again arrested upon another warrant issued by the same commissioner, and, while in custody, and before

the examination by the commissioner, Judge Parker adjudged the marshal guilty of a contempt for re-arresting the female; and he was committed to jail under that judgment. Judge McLean, on the petition of the marshal, issued a writ of habeas corpus, returnable before him; and after full argument on the facts stated, ordered the marshal to be discharged from imprisonment. The learned judge did not hesitate to issue the habeas corpus, under the statute of 1833, and admitted evidence of the facts relating to the imprisonment of the marshal, and discharged him on the ground that he was imprisoned for an act omitted to be done in obedience to law. Although in that case there had been a judgment by a court of record, that the alleged fugitive was entitled to her discharge, this was not held to be conclusive; and the judge asserted the right of going behind the judgment and examining the whole proceeding. The result was, that the imprisonment of the marshal was declared to be illegal, and for an act omitted, pursuant to the law of the United States. In his opinion, the judge says: "A sense of duty compels me to say that the proceedings of the honorable Judge Parker were not only without authority of law, but against law, and that the proceedings are void, and I am bound to treat them as a nullity." Another case, cited in argument, Ex parte Jenkins [Case No. 7,259], asserts the power of a federal judge to issue the writ of habeas corpus in all cases within the language of the act of 1833, and to discharge, under all circumstances, where the imprisonment is for an act done by authority of the United States. The learned Judge Grier, of the supreme court of the United States, in his opinion in that case, says: "The authority conferred on the judges of the United States, by this act of congress, gives them all the powers which any other court could exercise, or gives them none at all. If under such a writ they may not discharge their officer, when imprisoned by any authority, for an act done in pursuance of a law of the United States, it would be impossible to discover for what useful purpose the act was passed. Is the prisoner to be brought before them only that they may acknowledge their utter impotence to protect him?" The case last referred to is very similar, in several of its aspects, to the one before this court. In that case several deputy marshals were resisted in their attempts to arrest a fugitive. A complaint was made before a justice of the peace, charging the deputies with an assault and battery on the fugitive; a warrant was issued by the justice and the deputies were lodged in jail. They applied for a writ of habeas corpus; and although it appeared on the hearing they had been committed on process, legal and right on its face, Judge Grier received evidence that the deputies were imprisoned for an act done in the discharge of their duty, and without hes-

itancy delivered them from the custody of the jailer. These cases establish beyond doubt, that a federal judge, or court, upon the return of a habeas corpus issued pursuant to the act of 1833, setting up an imprisonment under state process, regular on its face, may receive evidence as to the facts connected with such imprisonment; and, if it appears to have been for an act done or omitted in the performance of official duty, to order the discharge of the party. There is no reason to doubt the correctness of this construction. It does not imply any invasion of the sovereignty of the state, whose process is thus treated. Nor is it based on any assumption or claim that a federal court or judge has any jurisdiction to revise or set aside, the judgments of the courts or magistrates of the state. It is merely the exercise of power to inquire into the cause of imprisonment; and if such cause is within the contemplation of the act, to grant an order for the discharge of the imprisoned party. Neither does it import, as suggested in the argument, that a federal judge or court can protect an officer of the United States from punishment for a crime committed against the laws of the state, under pretence that he was doing his duty. If the jurisdiction, to the extent indicated, does not exist, it is very clear the sovereignty of the United States is liable every day to be contemned and trampled upon. Upon any other view, it is entirely in the power of any one, corrupt enough to make a false oath against an officer of the United States, having charge of offenders against its laws, to procure their release, and most effectually to obstruct and nullify the legislation of the Union for the punishment of crime. It is easy to conceive, how not only the fugitive-slave law, but the laws for the protection of the post-office department, and laws punishing the making of spurious coins of the United States, may be defeated in their salutary operations, if the jurisdiction referred to does not exist.

It is now proper to inquire, whether from the facts before the court, it sufficiently appears the deputy marshals were in the rightful and proper discharge of their duties, when the act charged upon them as a crime against the state of Ohio was committed. I shall endeavor to do this as briefly as possible. In the first place it may be remarked, that these deputies were in the possession of lawful process for the arrest of parties charged with a violation of the laws of the United States. And it may be also noticed, that it was not optional with them whether they would serve the process. They were under the obligation of an oath, not only to support the constitution of the United States, but faithfully and promptly to serve all legal process which should come into their hands for service, and were subject to punishment for not doing so. There is no question, from the evidence, that the warrants referred to, were legally served, and that the prisoners

were legally in the custody of the deputy marshals. Having the prisoners thus in lawful custody, they had an undoubted right to use all the force necessary to retain them in such custody. And in case of an open, undisguised attempt to rescue them by force, they would be justified in killing the assailants, if that were necessary to retain the possession of their prisoner; and such killing clearly would not be a crime against the state of Ohio. But it is insisted that the sheriff of Clark county was in possession of a valid and legal writ of habeas corpus, which he was attempting in good faith to serve, and that he was violently and illegally resisted by the deputy marshals in such attempt. On the other hand, it is urged that the habeas corpus placed in the hands of Sheriff Layton was merely colorable, issued in fraud of the law, and was a part of a conspiracy by which to effect the rescue of the prisoners. This writ has been the subject of much comment by counsel; and authorities have been cited to show that it was a nullity, and that the sheriff was under no obligation to serve it. As a consequence, it is insisted, the deputy marshals were not bound to respect it, and could incur no liability for resisting its execution.

I cannot take the time necessary to discuss or decide all the points made in the argument in reference to this writ. The transcript of the proceedings by the judge of probate of Champaign county, who issued the writ and to whom it was returnable, and by whose order the prisoners were discharged, is before me. The writ was obtained upon the application of one F. W. Greedhough, who, against the truth of the case, took upon himself the responsibility of swearing that the prisoners were detained in custody, by Churchill, without legal authority. It was issued under the Ohio act of 1856, and is directed, not to the person having the prisoners in charge, but to any and all the sheriffs of the state of Ohio, without any showing, "by affidavit or otherwise," that the officer or person having the prisoners in custody will refuse or neglect to obey the writ. This obvious disregard of the provisions of the statute, I suppose, invalidates the writ, and a sheriff would have incurred no liability by a refusal to serve it. But I do not propose to discuss this question, nor to comment on the strange and anomalous provisions of the statute referred to. It will suffice to say that while it provides for a writ, designated as a writ of habeas corpus, the writ has really none of the qualities or characteristics of that great writ of right. Whatever may have been the design of the statute, it seems admirably suited to effect the rescue of any prisoner in the custody of an officer of the United States. All that is needed for this purpose, is an affidavit that such prisoner is illegally detained in custody, and by the aid of this statute it would be practicable upon the oath of an unscrupulous affiant, to effect the discharge of a prisoner in the penitentiary, under sentence of any court of the United States.

But it is further objected to the writ issued by the probate judge, that he had no jurisdiction, and that the writ is therefore a nullity. A great number of cases have been referred to in the argument in support of this position. Without a critical notice of these cases, it may be sufficient to remark, that the doctrine seems now to be settled that a state judge has no jurisdiction to issue a writ of habeas corpus for a prisoner in custody of an officer of the United States, if the fact of such custody is known to him before issuing the writ. And it is well settled that if, upon the return of the writ, it appears the prisoner is in custody under the authority of the United States, the jurisdiction of the state judge is at an end, and all further proceedings by him are void. In Case of Sims, reported in 7 Cush. 285, the supreme court of Massachusetts decided, that in all cases "before a writ of habeas corpus is granted, sufficient probable cause must be shown; but when it appears upon the party's own showing that there is no sufficient ground prima facie for his discharge, the court will not issue the writ;" and again the court say: "It is not granted as a matter of course, and the court will not grant the writ of habeas corpus, when they see that in the result they must remand the party." In the case of Norris v. Newton [Case No. 10,307], Judge McLean says: "I have no hesitation in saying that the judicial officers of a state, under its own laws, in a case where an unlawful imprisonment is shown by one or more affidavits, may issue a writ of habeas corpus, and inquire into the cause of detention." The learned judge, it will be noticed, has reference to an imprisonment under the authority of the United States, and decides, as the condition on which a state judge may issue a writ of habeas corpus, that it shall first be shown, by affidavits or otherwise, that such imprisonment is unlawful. And he holds, that when it is known to the judge that the imprisonment is under a law of the United States, his jurisdiction ceases, and all further proceedings in the case will be coram non judice.

It does not appear from the transcript of the proceedings before the probate judge of Champaign county, that the prisoners were in custody under process of the United States; but it is hardly supposable that the fact was not known to that judge. But as this is not shown in the transcript, it cannot be assumed as a fact. A strong light is, however, cast upon this transaction by the proof before the court, that when the prisoners were brought before the probate judge, and when it was his duty to inquire into and ascertain the precise ground on which they were held in custody by the deputy marshals, he ordered them to be summarily discharged. The reason of this order, as appears from the transcript, was, that no one appeared to show by

what authority the prisoners were arrested and held in custody. The truth was—whether known to the probate judge does not appear—that the deputy marshal named in the proceedings, and who was so solemnly called and defaulted for his non-appearance, was, at the time, a close prisoner in the jail of the adjoining county of Clark!

It is also insisted, in argument, that if the deputies had the lawful custody of these prisoners, and were justified in resisting any attempt to take them by a state officer, that such resistance was excessive, and that, by such excess, they have forfeited the protection intended by the act of 1833, and are amenable to the law of Ohio. As before noticed, the only question with which I am now to deal is, whether the act charged as criminal against the deputies was done in the proper discharge of their official duties. This inquiry necessarily leads to a notice of some of the facts before the court, in connection with the attempted rescue of the prisoners. Many of the statements in the affidavits have no reference to this transaction, and need not be specially noticed. It is the alleged violence of the deputies in resisting the sheriff, that forms the basis of the complaint against them before the justice of the peace of Clark county. If in this they have done no more than their official duty justified them in doing, they are within the protection of the act of congress. In stating my views on this point of the case, I shall not attempt a critical examination of the statements of the witnesses on either side. In some important particulars there are discrepancies and contradictions in the facts set forth in the numerous affidavits which have been read. I shall make no effort to reconcile these; nor is it necessary that I should indicate an opinion as to the credit due to the conflicting statements.

There are some considerations which are conclusive of the question indicated. In his oral evidence, if not in his affidavit, Sheriff Layton admits he was notified when the writ of habeas corpus was placed in his hands, that the persons having the custody of the prisoners were deputy marshals, and held the prisoners under the authority of the United States. It is very clear, upon the authorities before referred to, that, with a knowledge of this fact, even if the writ were valid, the power of the sheriff was at an end, and he was wrong in attempting the service. As an officer sworn to support the constitution of the United States, he was under no obligation to serve it, and would have incurred no liability in refusing to do so. His return of the fact that the prisoners were held by the paramount authority of the United States, would have been a complete justification for not serving the writ. He was fully aware that the writ could not be served without bringing the authorities of the United States and the state of Ohio into direct collision, and that the issue to be settled was purely one of physical power. If unnecessarily, and

against the obligations of official duty, he placed himself in a position of peril, he may be supposed to have done so with a full knowledge of what the consequences might be, and a determination to meet them at all hazards. To understand the nature of this conflict, it should be remembered that the deputy marshals, by their official oaths, were under a positive and paramount obligation to retain their prisoners, and to oppose all attempts to rescue them. The prisoners were lawfully in their custody, and they would have been derelict in duty to have parted with that custody, unless compelled to do so by an overpowering physical force. The sheriff had a writ which commanded him to take the prisoners from the custody of these officers of the United States. It was not the usual and well-known writ of habeas corpus, summoning the party having the alleged unlawful custody of the persons named in the writ, to have them before the officer issuing it, with the cause of their detention, but a writ requiring them to be taken, forcibly, if necessary, from those having the prior and lawful custody. This was the only way of serving the writ; and the question whether it could be served, was simply a question of power. So the sheriff understood it; and hence he and his assistants deliberately armed themselves, as a preparation for the conflict which they foresaw was inevitable. In serving the writ, their first object was to do what the writ required—namely, to take the prisoners from the custody of the deputy marshals. Counting, probably on the active co-operation of the prisoners, they made this attempt. It is altogether immaterial whether the sheriff, on coming up with the United States officers, announced his official character, or that he had a writ requiring him to take the prisoners. If such announcement were made—which is doubtful from the weight of the testimony—it was an idle form, which the deputies were not bound to respect, and which can have no influence in the decision of this question. They would have been faithless to their duty if they had quietly surrendered their prisoners upon such a notice.

It is apparent, from facts not in controversy, that the sheriff and his assistant well understood how the writ was to be served. They were apprised that a mere statement that they were officers of the state of Ohio, and had a writ of habeas corpus for the prisoners, would come altogether short of the exigency of the writ. They knew that nothing but the actual capture of the prisoners and their corporeal custody would answer its demands. Hence, the first movement was the seizing, by the assistant of the sheriff, of the bridle of the horse in the foremost carriage. He was resisted in this attempt, and immediately aimed his revolver at the deputy; and, if he did not actually fire, it is beyond all question he made the attempt. Whether he fired, or only made the attempt,

the officer whose life was thus put at hazard, had an undoubted right, in self-defence, to disable his assailant, and was fully justified in firing at him with this view. It may be noticed here, as throwing some light on the intention of the sheriff and his assistant, that the sheriff states as his impression that his assistant, as he drove past the rear carriages, pointed his pistol from the carriage in which he rode; thus giving a very significant indication of what might be expected if the prisoners were not peaceably surrendered. But it is said the sheriff was most wantonly injured in this affray. In his oral testimony he states that, after leaving his buggy, he approached the carriage in which Churchill rode, with pistol in hand, prepared to fire, and intending to fire at Churchill. This fact is clearly proved by many other witnesses in their affidavits; and it is also proved beyond doubt, that it was when the sheriff was thus approaching Churchill, that the latter seized him, with the sole view of disarming him, and thus saving his own or the life of another person. It is greatly to be regretted that the sheriff was so severely injured in this rencounter; but if any fact is established in this case, it is that these injuries resulted from the conflict in the attempt to disarm him. In such a contest, the degree of force which may be used cannot be graduated with absolute precision. If the writ put into the hands of the sheriff had been issued in good faith, and were the well-known writ of habeas corpus, requiring the deputy marshals to produce the bodies of the prisoners, for the purpose of inquiring into the cause of their detention, it would have been the duty of those officers to take the persons before the judge. If not as a matter of legal obligation, the courtesy due to the authorities of another jurisdiction would have required this. In doing this they would have retained the possession of the prisoners, as no state judge, it may be presumed, would have authorized their discharge, when it was made known to him that they were held under valid United States authority. But, as before noticed, the writ under the extraordinary Ohio law of 1856, requiring the officer to whom it is directed to take the prisoners, no matter by whom or by what authority they are detained, is a wholly different thing. This act seems to have been inconsiderately passed, and in its practical execution must lead to frequent conflicts between the national and state authorities. It might, with great propriety, be designated as an act to prevent the execution of laws of the United States within the state of Ohio.

It seems clear that the deputy marshals were right, under the circumstances of this case, in resisting the attempt to rescue the prisoners from their custody. Judge Nelson, one of the justices of the supreme court of the United States, has stated the law on this point with great force and accuracy. While he concedes that there may be cases in which a state judge may be justified in granting a habeas corpus for a prisoner in confinement under United States process, he asserts that, if the process is legal, the officer having the person in charge will not be justified in surrendering that custody under any circumstances. The learned judge says: "In such case—that is, where the prisoner is, in fact, held under process issued by a federal tribunal, under the constitution, or a law of the United States, or a treaty—it is the duty of an officer not to give him up, or to allow him to pass from his hands at any stage of the proceedings. He should stand upon his authority; and, if resisted, maintain it with all the power conferred on him for that purpose." 1 Blatchf. 635. Even in cases where there is concurrent jurisdiction in the general government and a state, it is well settled, both by the adjudications of the federal and state courts, that the tribunal to which the jurisdiction first attaches shall retain it. In the case Ex parte Jenkins, before cited, Judge Grier says: "Where persons or property are liable to seizure and arrest by the process of both, that which first attached should have the preference. Any attempt of either to take from the legal custody of the officers of the other, would be an unjustifiable exercise of its power, and lead to most deplorable consequences." Such is the law where there is an admitted concurrent jurisdiction. With how much greater force does it apply where the right or power exercised is exclusive in the United States?

It cannot be necessary to notice further the legal points arising in the case, or the numerous facts set forth in the affidavits. The conclusions indicated seem to be fully sustained by the law and the facts. There is, however, a general view of the case, that leaves no doubt as to the real character of the transaction involved. It cannot be controverted, that there was a settled purpose, in at least a portion of the community in which these occurrences took place, to prevent, either by direct or indirect means, the execution of a law of the United States. Four persons had been arrested, under legal process, for an alleged violation of one of the provisions of the fugitive-slave law. There is known to exist, in the counties to which reference has been made, a decided feeling of hostility to that act; and the opinion is entertained—it may be honestly by many—that the law has no validity, and is not entitled to respect or obedience. Those entertaining these extreme views, seem to suppose there is not only no wrong, in any attempt to prevent its execution, but that such attempt is in itself meritorious. With such views, it is not strange that men should be prepared for extreme and indefensible measures to render the law inoperative. It does not admit of a doubt that practical nullification was the purpose of those who opposed the officers of the United States in the execution of their duties on the occasion referred to. Great excite-

ment prevailed, and crowds followed the officers in charge of the prisoners. From their excited bearing, there were reasons for the apprehension that an undisguised and forcible attempt at a rescue would be made. It does not change the real character of the views and purposes of these persons that they deemed it most expedient to effect their object by a resort to the forms of law.

Much has been said by counsel on the importance of the questions involved in this case. The danger of invading the sovereignty of the state of Ohio has been exhibited in most' eloquent and forcible terms; and the court has been admonished of the fearful results of the exercise of jurisdiction in this case. It is readily conceded that a federal judge or court should tread with cautious steps upon the line dividing the national and state sovereignties. But it should be remembered that sovereignty pertains to the government of the United States as well to that of the states. The general government within its constitutional limits is supreme and its action is paramount to any opposing action on the part of the states. Every right-thinking and right hearted American citizen will feel and admit the obligation resting on him to sustain the just powers of the Union as well as of the state in which he resides. A proper fealty to both is due from and demanded of every citizen; and these obligations are neither repugnant or inconsistent. Upon the just recognition of each depends the existence and perpetuity of our government.

Now, the practical question in this case is, whether a law of the United States can be evaded and set at naught, either by direct and violent opposition, which is rebellion, or by the specious pretences of law. And this question is in no degree affected by the character of the law sought to be nullified. I know well there is a deep seated hostility to the fugitive-slave act of 1850 throughout most of the free states. I am also aware that there is among the people of Ohio an almost unanimous sentiment in opposition to slavery; and that there are few, if any, of her citizens, who desire its introduction into the state. But these considerations do not excuse or justify attempts to defeat the national laws, sanctioned by the constitution of the United States, growing out of the existence of that institution, in other portions of the Union. There may be very strong and well-founded objections to the law referred to, but, while it is a law, it must be respected and obeyed as such. The power called forth in its enactment is one which belongs exclusively to the government of the Union, and with which the states have no right to interfere. It· should be remembered, too, that it is an emanation of the will of the nation, expressed through the representatives of the states and the people, according to the forms of the constitution. Its repeal, by the same power that passed it, is the only method by which it can cease to have.

the force of law. It is unquestionably true. that every citizen has a right to, and may enjoy and express, without stint or hindrance his opinions upon any law or measure of public policy; but it does not follow that he may evade or resist the execution of a law, because he regards it as unjust or inexpedient. If one man is to be tolerated in such evasion or resistance, in regard to one law, others may do the same as to other laws. The result would be, that every man, being a law unto himself, and acting under some vague notion of a higher law, would choose for himself what laws he would obey. This would produce a state of unmitigated anarchy, and effectually undermine the foundations of the social fabric. It is wholly beyond the limits of man's mental power to estimate the deplorable results of the prevalence of such a doctrine. As an unavoidable sequence, the bands of that· union, which has been so potent for good to our country, so instrumental in its rapid advance to prosperity and greatness, would be dissolved. In this event, a future would be presented which none could contemplate without the deepest horror. I trust no such calamity is in store for this nation. It is matter of devout thankfulness that the safety of the Union is not placed in the keeping of politicians, or extremists of any school or any section of the country. In the underlying depths of public opinion, whatever may be the agitations on its surface, there is an overmastering power which, if the emergency shall arise, will come forth as a strong man armed in defence of the common bond of national brotherhood and national existence.

The deputy marshals are discharged.

SIGEL (FREEDMAN v.). See Case No. 5,080.

SIGEL, The FRANZ. See Case No. 5,062.

SIGEL, The GENERAL FRANZ. See Case No. 5,311.

SIGER (CHAPIN v.). See Case No. 2,600.

SIGNAIGO (GAFFNEY'S ASSIGNEE v.). See Case No. 5,169.